O4AVCOMC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

COMCAST CABLE COMMUNICATIONS
MANAGEMENT, LLC and COMCAST
CABLE COMMUNICATIONS, LLC,

           Plaintiffs,

      v.                      23 Civ. 4436 (AKH)

MAXLINEAR, INC.,

           Defendant.        Conference

------------------------------x

                                    New York, N.Y.
                                    April 10, 2024
                                    2:35 p.m.

Before:

                HON. ALVIN K. HELLERSTEIN,

                              District Judge

                   APPEARANCES

DAVIS POLK & WARDELL LLP
    Attorneys for Plaintiffs
BY:  DANA M. SESHENS
     CRAIG J. BERGMAN
     ANNA L. NORD

KIRKLAND & ELLIS LLP
    Attorneys for Defendant
BY:  ATIF N. KHAWAJA
     MEGAN McGLYNN

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              (Case called)
2              THE DEPUTY CLERK:  Counsel, please state your
3     appearances for the record.
4              MS. SESHENS:  Good afternoon, your Honor.
5              Dana Seshens, Davis, Polk & Wardell LLP, for the
6     plaintiffs.  Here with me today are my colleagues Craig Bergman
7     and Anna Lee Nord.
8              MR. KHAWAJA:  Good afternoon, your Honor.
9              Atif Khawaja of Kirkland & Ellis, on behalf of
10    defendant MaxLinear.  And with me is Megan McGlynn.
11             THE COURT:  I've read the third amended complaint.
12    I've read Comcast's brief and MaxLinear's brief.  And I thought
13    it would be useful just to get some questions put to you or
14    maybe answers.
15             Does MaxLinear wants to stop performance in May of
16    2024, May of this year?  Does it consider the termination
17    notice that it issued previously to become effective May 2024?
18    Are you able to answer that, Mr. Khawaja?
19             MR. KHAWAJA:  Your Honor, I can try.  I can come to
20    the podium.
21             THE COURT:  Please.  Yes.
22             MR. KHAWAJA:  Okay.
23             And just repeat the question one more time.
24             THE COURT:  You want to quit the business?  Do you
25    want to quit?

MR. KHAWAJA:  We absolutely wanted to quit, and that's why we served the termination notice in May of '23.

THE COURT:  But you consider it effective now as of May of 2024?

MR. KHAWAJA:  We considered it.  And it's a little bit of an academic question, because I don't think there's any harm flowing from how we consider it.  But we considered it effective in May of '23.  All the services that the contract contemplates we stipulated to providing through May of '24, which is the date in complaint paragraph 47 they say the services end.

There's an additional contract --

THE COURT:  But you don't want to go forward?  It's not clear from what everybody is saying.

MR. KHAWAJA:  We intend to stop.  We have put forth a proposal to continue those services.  The parties have not reached agreement on those services.

THE COURT:  As I understand the contract, when services stop for a year, you then have 90 days to terminate. Is that a correct understanding?

MR. KHAWAJA:  I think that there is a -- I think the thing that we're getting caught up on — and again, I continue to think it's a little bit of an academic question, because there's no harm that's flowing from any of this delta between the notice of termination and the post-termination obligations.

O4AVCOMC

1           THE COURT:  I have to understand that.
2           MR. KHAWAJA:  I think Comcast's position -- and we've
3  got a motion --
4           THE COURT:  Your position on the contract, what's your
5  contract position?  Am I reading the contract correctly to say
6  that after services stop for a year, you then have 90 days
7  within which to terminate?
8           MR. KHAWAJA:  So there's two pieces of the contract;
9  there's the VSA and the SOW.  I think the contract contemplates
10 that notice would be given.  And then within a year after that,
11 the SOW would stop.  And then additionally, after a year of no
12 services plus 90 days, then there would be the VSA termination.
13 I think that's roughly the timeline.
14           I think we have agreed to provide all of the services
15 in the SOW.  We don't want to have a contract between us unless
16 there's a new one entered.
17           On the VSA, this carryover, just to kind of -- I think
18 I'm anticipating where you're going, your Honor.  There's
19 another contract that's VSA that's out there.  You see this in
20 paragraph 43 of their complaint.  They have a declaratory
21 judgment claim that somehow it should still be around til
22 August of 2025.
23           In the first instance, your Honor, again, there's no
24 threatened actual possible --
25           THE COURT:  I don't want to argue the motion.

1           MR. KHAWAJA:  Understood.

2           THE COURT:  This is not the place for arguing the

3  motion.  I wanted to have this meeting because I want to try to

4  understand the economics of what's going on.

5           MR. KHAWAJA:  Understood.

6           THE COURT:  And it's not very clear to me.

7           From Comcast's position, what do you want of

8  MaxLinear?

9           MS. SESHENS:  Your Honor, do you want me to --

10           THE COURT:  Yes, please.

11           MS. SESHENS:  Okay.  Thank you, your Honor.

12           For the record, Dana Seshens, on behalf of the

13  plaintiffs.

14           So what we want, your Honor, is adherence to the

15  contracts.  And to your Honor's point, that's performance of

16  services under the statement of work which I understand

17  MaxLinear has agreed to provide and, as we talked about last

18  time, has been providing; and they've agreed to do that until

19  May 23rd of 2024.

20           We also want adherence to the VSA.  And that is the

21  additional year and 90 months that your Honor referenced.  So

22  that's how we get to the August 2025 date.

23           THE COURT:  You want to tie them up for another year

24  and three months.

25           MS. SESHENS:  Well, they're bound by that contract.

1 They signed it at the time.

2 THE COURT: But that's what you want.

3 MS. SESHENS: Correct. There are obligations in there
4 that are of critical importance. They were bargained for by
5 sophisticated parties. And yes, we intend to enforce that
6 contract pursuant to its terms, which is why we've sought the
7 declaratory judgment.

8 THE COURT: Both of you, can you just tone this down.

9 MS. SESHENS: Yes, your Honor.

10 THE COURT: This is not an argument. We're not there
11 yet. I want to understand it, and you're not helping me by
12 being very emotional about your case. I know you're emotional.
13 You should be. But control it.

14 MS. SESHENS: Understood, your Honor.

15 THE COURT: So from a business point of view, if they
16 stop, you know, contracting parties can just stop, they can
17 breach a contract, if they stop, is there anyplace else you can
18 get your stuff?

19 MS. SESHENS: There's no place else we can get
20 comparable, you know, obligations that are under the VSA;
21 because those are specific to MaxLinear insofar as it has our
22 confidential information. It has specific requirements it has
23 to adhere to to protect Comcast. There is a covenant not to
24 sue, there's an indemnification obligation.

25 If your question is, as a business matter, if there's

1   another place to get the services --

2   THE COURT:  That's my question.

3   MS. SESHENS:  Yes.  So obviously MaxLinear has said

4   they are going to stop, and Comcast has taken steps and is

5   preparing for them to do so.  So whether we can get them

6   somewhere else or figure out another plan, I'm not privy to all

7   the business details, but I can represent that we are taking

8   steps to prepare for them to conclude services in May of 2024.

9   THE COURT:  I read your complaint as really a request

10  for mandatory injunction.  You're asking for declaratory

11  judgment, but the purpose of the declaratory judgment is to

12  require MaxLinear to continue with the contract.

13  In normal situations, a party could elect to breach

14  and pay damages, the difference between the contract price and

15  the market price.

16  So one problem I have is that you have to show that

17  there's no adequate remedy at law, which you haven't.  And I

18  think that may be a flaw.  I wanted to spot it now.  It's not

19  raised in the brief, as I remember it, but it came up in my

20  mind.

21  MS. SESHENS:  Your Honor, I appreciate the question.

22  And to address it squarely, I think, given the request we've

23  sought, we don't need to show that.  I understand your Honor's

24  perspective on it being one could argue, I suppose, a mandatory

25  injunction.  But all we're seeking is a declaration that the

1    contract operates by its terms.

2             They could choose to breach it, to your point, during

3    that period of time that it remains in effect and then we'd

4    have a claim for damages if they choose to do that.  But right

5    now, they are running around telling your Honor, telling the

6    Court in California, that the contract is terminated, when it's

7    not.  And that is something we're looking to avoid coming back

8    to your Honor with a damages claim.  It's not requiring them to

9    sort of have a mandatory injunction, because it's not perpetual

10   but, rather, it's just a declaration of how the contract

11   operates given the positions that they've been taking.

12            THE COURT:  Normally I'm not in the business of giving

13   advice, and that seems to me what you're asking.

14            MS. SESHENS:  Well, I think, your Honor — and I know

15   that the motion is pending and we obviously intend to oppose

16   it.  But I think the case law is pretty clear on this.  I don't

17   want to argue if your Honor doesn't want to hear it.

18            THE COURT:  No, I haven't read your briefs yet.

19            MS. SESHENS:  Right.

20            But there is a plethora of case law that would say

21   when there is a dispute over how a contract operates, you don't

22   have to actually wait for the harm to befall the nonbreaching

23   party.  You can get a declaration.  And that's all we're

24   seeking here.

25            THE COURT:  How would this be different than an

1    anticipatory breach?

2              MS. SESHENS:  I think it may not be all that different

3    in the sense that they have said that they are, you know,

4    viewing the contracts as terminated.  But I'm not sure that

5    affects the relief that we're seeking because I think in an

6    anticipatory breach context, I think we could still come in and

7    request that the Court issue a declaration that the contracts

8    remain in force.

9              THE COURT:  Thank you.

10             Question for Mr. Khawaja.

11             It appears that the California court held that the

12   only way that the patent infringement lawsuit by Entropic could

13   succeed is if it alleges and proves willful infringement.

14             Does that suggest that MaxLinear has an interest in

15   that litigation?

16             MR. KHAWAJA:  I don't think it suggests that, no.

17             THE COURT:  Normally, a patent infringement case does

18   not require willfulness.

19             MR. KHAWAJA:  That is true.

20             I think what the Court was doing there — and I think

21   this is important context for your Honor.  And I'm not trying

22   to argue, I'm just giving you the facts here; it's in their

23   complaint.

24             When Comcast was sued for infringement by Entropic in

25   the Central District of California, Comcast asserted in a

motion to dismiss that the covenant not to sue applied.  And the Court, in construing -- the Central District of California, in construing that covenant not to sue, the Court said that whatever the covenant not to sue is, it doesn't extend to claims of willful patent infringement.

THE COURT:  That's those terms of this contract that you have with Comcast.

MR. KHAWAJA:  Between MaxLinear -- in other words --

THE COURT:  No reason for it -- no reason for the court in California to say that, unless MaxLinear was a party in some fashion.

MR. KHAWAJA:  We're not a party to that.  I know they've accused us in the complaint of being a litigation proxy.

But I think what the Court was doing there was, importantly, Entropic was bringing claims for willful patent infringement.  And so what Entropic was saying, when Comcast said, This covenant not to sue to which I'm a beneficiary of, it should bar the suit.  MaxLinear couldn't bring this suit; Entropic, you shouldn't be able to bring this suit.

Entropic said, Wait.  Claims of willful patent infringement are outside of the covenant not to sue.  And what the Court did in construing that was confirm that claims of willful patent infringement are outside the covenant not to sue.  And since then --

1            THE COURT:  Yeah, but there would be no reason to
2  discuss the covenant not to sue unless MaxLinear were involved
3  in some fashion.
4            MR. KHAWAJA:  For sure.  We sold them the patents.
5            There's no question that Entropic is suing on
6  MaxLinear patents.  And as --
7            THE COURT:  If you've assigned, you have nothing left.
8            MR. KHAWAJA:  We have assigned the patent.  I am
9  honestly not familiar with the paperwork.
10            THE COURT:  Just by logical reasoning, an assignment
11  divests you of interest.
12            MR. KHAWAJA:  We cannot assert those patents, no.  We
13  have divested them.  And as Ms. Seshens conceded in the hearing
14  last month, there's nothing in any of the contracts between
15  MaxLinear and Comcast that prohibits assignment.
16            THE COURT:  I think if you want me to act on this,
17  you're going to have to clarify -- you have to find out more
18  about the patent litigation.  Because as it stands, there's an
19  inference in my mind that MaxLinear is involved.  Otherwise,
20  the Court would not obey that decision.
21            I don't know what the decision is; it's not been
22  brought to me.  I don't know what the assignment is; it's not
23  been identified.  It's part of this great unknown.
24            MR. KHAWAJA:  Understood, your Honor.
25            THE COURT:  Now, from a business point of view, what

1  is it that MaxLinear is providing?  It's providing chips, it's
2  providing some form of services.  What's the relationship
3  between the two contracts?
4           MR. KHAWAJA:  It's a great question.  So let me walk
5  through it.
6           We used to provide them chips.  We used to sell the
7  chips that were in the cable modem boxes that Comcast would
8  distribute to various customers in various geographies.  In
9  fact, we've tried to sell them more.  That was the purpose of
10 the VSA --
11          THE COURT:  Your brief said that you're not getting
12 orders.
13          MR. KHAWAJA:  We're not getting it anymore.
14          THE COURT:  So you're sorry you gave them a cheap
15 price.
16          MR. KHAWAJA:  Exactly.  That's exactly right.
17          So the VSA, it's a vendor support services agreement;
18 and it had a statement of work in it.  The statement of work
19 was to support those boxes that are in the field, to make sure
20 that they get updates, to make sure the Russians aren't hacking
21 them, to make sure that they are still working.  And we've been
22 doing that.  We told them even when we terminated, we're going
23 to continue to support people.  That's why when they filed the
24 PI --
25          THE COURT:  So what are you terminating if you're

1  going to continue to support?

2  MR. KHAWAJA: Because we want clarity that -- so a

3  couple of things. I think we want clarity that we don't have a

4  relationship anymore. We're tired -- they obviously think this

5  contract means something that we don't.

6  THE COURT: You want clarity. You also want a

7  declaratory judgment then.

8  MR. KHAWAJA: Well, I don't know that there's an

9  opinion here that your Honor needs to issue. I don't think we

10  need a declaratory judgment. I think every obligation they've

11  identified that could be a possible breach we've done. The

12  support we've done.

13  Now, on the VSA --

14  THE COURT: I still can't understand, if you're

15  continuing to work, why is there a dispute?

16  MR. KHAWAJA: So I think the real issue is what

17  happens after May of 2024, your Honor. Because the support --

18  THE COURT: What will happen?

19  MR. KHAWAJA: Well, I think we know what's going to

20  happen. I think both sides agree, and you see this in her

21  complaint and I don't think there's an issue with this.

22  They're not entitled to any service.

23  THE COURT: I'm not interested in what they're

24  entitled. I'm interested in what you're going to do.

25  MR. KHAWAJA: We're not intending to provide any

1   support after May 23rd of 2024.

2           THE COURT:  You're going to quit the contract
3   altogether or quit the relationship altogether.

4           MR. KHAWAJA:  We're going to stop providing the
5   services that we were providing.

6           Now, there's an important caveat to that.  And I'm
7   going to read you some language, because she mentioned it.
8   It's in their complaint.  There's this other contract that she
9   mentioned in her mind continues for a year.  It's the VSA.

10          It has confidentiality, information security, employee
11  adequacy and cooperation.  We have not received any request
12  somehow suggesting we're in noncompliance.  We're happy to
13  continue those things.  We're happy to keep their information
14  confidential.  We have no intention of publishing it, of doing
15  anything wrong, we have not threatened to do that.

16          THE COURT:  Is there anything in the VSA other than
17  these negative covenants?

18          MR. KHAWAJA:  One of the negative covenants is
19  important to us.

20          THE COURT:  What are you supposed to do?

21          MR. KHAWAJA:  Exactly.  There's nothing else.  It's
22  just negative covenants.  It's just negative covenants.  And so
23  that's why we're at a loss and we think you'd be doing an
24  advisory opinion.

25          One of the negative covenants matters to us, your

1    Honor, and I want to explain why we're not agreeing to
2    stipulate to the VSA for another year.  And that's because one
3    of the negative covenants is a covenant not to sue.  And as
4    your Honor knows, we've got a claim for knowing trade secret
5    misappropriation that we'd like to bring.
6              THE COURT:  A claim of what?
7              MR. KHAWAJA:  For trade secret misappropriation.
8              THE COURT:  Is that what's going on in California?
9              MR. KHAWAJA:  No, that's a patent case between
10   Entropic and MaxLinear.
11             THE COURT:  What is it that you want to sue on?
12             MR. KHAWAJA:  So this was pled earlier.  We had a
13   compulsory counterclaim we raised to their allegations of
14   breach of the covenant not to sue and other claims related to
15   the knowing misappropriation by Comcast of MaxLinear trade
16   secrets.  And we pled it before.  Per your Honor's
17   instructions, we haven't pled it yet because we wanted to see
18   if --
19             THE COURT:  I don't understand.  If you are working,
20   and in order to work, get their trade secrets, why do they have
21   your trade secrets?
22             MR. KHAWAJA:  We gave them an idea for a product that
23   we were trying to sell to them.  They didn't buy the product.
24   They went to our competitor; they published what we gave them.
25   I can give you the docket number.  That was the trade secret

1     counterclaim we pled.  And they did it right after we entered
2     this VSA.
3              THE COURT:  That's the same case as the lady who gives
4     the television program an idea, and then they create a series
5     from it.  And she says, Oh, it's mine.  You should give it back
6     to me.
7              MR. KHAWAJA:  Except they did it pursuant to an NDA.
8     The same person who did it attended a meeting with us.  And --
9              THE COURT:  All right.  I get it.  I get it.
10             MR. KHAWAJA:  It's far more attenuated than that.
11             THE COURT:  I get it.
12             MS. SESHENS:  Your Honor?
13             THE COURT:  Yes.
14             MS. SESHENS:  May I address just one of your questions
15    you posed to Mr. Khawaja?
16             THE COURT:  Sure.
17             MS. SESHENS:  Okay.  I don't want to --
18             THE COURT:  I think he's finished.
19             MS. SESHENS:  Okay.  I think your Honor asked a
20    question that I just wanted to put a finer point on, which is,
21    why is there a dispute here?  And I think --
22             THE COURT:  Why is there a dispute?
23             MS. SESHENS:  Right?
24             Because you said, they're performing.  We've sought to
25    enforce our contracts.  And Mr. Khawaja has said, Well, we'll

1  oblige the negative covenants.  We'll pick and choose — which
2  is obviously not how contracts work — what we're going to do.
3          THE COURT:  No, he didn't say that.
4          MS. SESHENS:  But the import, my takeaway from it —
5  your Honor may obviously disagree — was we'll do everything,
6  but they don't want to adhere to the covenant not to sue.  And
7  that is what is driving the conduct, we believe, on the other
8  side, because of the patent infringement claims.  And this goes
9  back to your Honor's original questions about what's happening.
10         THE COURT:  Isn't the way to deal with this defense on
11 your part to their suit to move to dismiss on the ground it's
12 premature?
13         MS. SESHENS:  You mean in California?
14         THE COURT:  Anywhere.
15         MS. SESHENS:  So we have moved -- Comcast moved in
16 California to dismiss the complaint on the grounds of the
17 covenant, and the Court granted that motion and gave leave to
18 replead to allege willfulness.
19         Now, the first complaint that Entropic filed in the
20 Central District of California did not focus on willful patent
21 infringement and, in fact, we had allegations to this effect
22 previously.  It is --
23         THE COURT:  Now it does.
24         MS. SESHENS:  I'm sorry?
25         THE COURT:  Now that's the whole basis of the

1    complaint.

2             MS. SESHENS:  Correct, out in California.  The entire
3    focus now is on alleged willful infringement.  And Entropic at
4    the time it brought its suit --

5             THE COURT:  So if they just prove infringement, they
6    don't win.

7             MS. SESHENS:  I'm sorry?

8             THE COURT:  If Entropic just proves infringement, it
9    doesn't win.

10            MS. SESHENS:  The claim is barred by the covenant not
11   to sue during the term of the vendor support agreement.  And
12   that's the temporal piece that I think --

13            THE COURT:  Is that the holding of the Court?

14            MS. SESHENS:  I'm sorry, your Honor?

15            THE COURT:  Is that the holding of the Court?

16            MS. SESHENS:  The Court held — and we're happy to
17   provide the decision to your Honor — that the covenant applied
18   to the claims during the term of the VSA, consistent with the
19   terms of the contract, and that the plaintiff there, Entropic,
20   had failed to plead willful infringement.

21            THE COURT:  Don't send it to me.

22            MS. SESHENS:  I'm sorry?

23            THE COURT:  I don't particularly have any need for it.
24   I have enough to read.

25            MS. SESHENS:  Understood, your Honor.

1    It's more just to provide the context here.  Because
2 that is what's going on.  Entropic brought suit not for willful
3 infringement initially, just for plain old patent infringement
4 in violation of the covenant.
5    THE COURT:  So if you're suing -- if you're defending
6 in California, what do you need this lawsuit?
7    MS. SESHENS:  Well, there are contracts here with New
8 York forum provisions and New York choice of law provisions.
9 And we are seeking to enforce the VSA and the statement of work
10 in this Court because that's what the contracts direct us to
11 do.
12    THE COURT:  So isn't the right thing to do to see if
13 they violate and then sue them?
14    MS. SESHENS:  Well, we would submit, your Honor, that
15 the lawsuits in California already have violated.  We have
16 moved to dismiss on those grounds, as you've noted.
17    But the contracts need to remain in effect, the VSA in
18 particular.  This covenant not to sue is live during the term
19 of the VSA.  And that's why that extra year and 90 days
20 matters, to help your Honor -- just to provide context on the
21 temporal aspect of this.  And it's why they're fighting so hard
22 to try to do away with these contracts.
23    And our view is that the declaration we've sought,
24 which we believe is ripe and we'll brief, you know, it
25 accordingly, will sort of put an end to that point that

O4AVCOMC

1    everybody is saying there's no covenant, there's no VSA because
2    it has been terminated prematurely.
3             THE COURT:  Thank you very much.
4             MS. SESHENS:  Thank you, your Honor.
5             THE COURT:  Thank you both.
6             Is there something more you wanted to say?
7             MR. KHAWAJA:  No, your Honor.
8             I mean, the only thing I would just flag is that we
9    think that --
10            THE COURT:  No, I have nothing more to say, but I want
11   to flag something.
12            MR. KHAWAJA:  We're fine, your Honor.
13            THE COURT:  Okay, folks.  Have a good day.
14                           *    *    *